## THATCHER vs. DARR
### (No. 969; Decided August 6, 1921; 199 Pac. 938.)

CONTRACTS—AMBIGUITY OF TERMS OF AGREEMENT—CONSTRUCTION OF CONTRACTS — PLEADING — DEMURRER.— EVIDENCE — AGREEMENT TO GIVE OR SUPPLY EVIDENCE FOR COMPENSATION—PUBLIC POLICY—ESTOPPEL—CONDITION PRECEDENT — WAIVER — WITNESSES — DAMAGES.

1. A general rule of public policy invalidates agreements to give or procure testimony in litigation for a compensation dependent upon the recovery or the amount of it, or for a sum in excess of legal witness fees where the witness is subject to subpoena, or containing other elements tending to show that the evidence may be improperly influenced.

2. To bring a case within the rule invalidating contracts to testify or procure testimony for a compensation exceeding legal fees where that is the only ground of objection, it must appear that the agreed compensation is to be paid for performing merely a legal duty and also, of course, that fees for the services required of the witness are fixed by law.

3. The reason of the rule invalidating agreements to give or procure testimony for a compensation exceeding legal fees is that witnesses might otherwise make terms for testifying under one pretense or another that would be corrupt and oppressive, or might be tempted to barter their oaths at the expense of truth and justice.

4. A contract providing for the giving of testimony by affidavits in proceedings wherein no witness fees are prescribed nor compulsory attendance of witnesses provided for by law, held not invalid on the ground that it provides for compensation for the performance merely of a legal duty, or not in excess of legal fees.

5.  A contract wherein mineral claimants in transfering their interests therein agreed with the transferee to furnish affidavits as to the truth concerning their acts and intentions to aid transferee in procuring Government patents, in consideration of which they received from transferee stock of the aggregate par value of $7,000.00, which stock transferee therein agreed to take back, or repurchase for cash at par within one year after patents had been issued for the claims, held not invalid as an agreement to furnish evidence for a contingent compensation.

6.  A transferee of mineral claims, who gave corporate stock therefor of the aggregate value of $7,000.00 and agreed to repurchase said stock at par for cash within one year after the issuance of Government patents to him for the mineral claims in question cannot avoid his obligation to repurchase such stock on the ground that patents for only a portion of the claims were issued, it appearing that he had abandoned and waived his claim and right to the remaining part of the land not included in the patent thereby causing the patent to be issued for the part only included therein.

7.  Where a party to a contract by his own act, prevents the happening of a condition, he is estopped thereafter to say that such condition has not happened. No party to a contract can interfere to prevent the performance of any condition and then claim any benefit, or escape any liability from the failure of such performance.

ERROR to the District Court, Big Horn County; HON. P. W. METZ, Judge.

Action by J. D. Thatcher and others against D. L. Darr to recover damages for the breach of a contract providing for the repurchase of corporate stock by defendant. A demurrer filed to the amended petition was sustained by the trial court and plaintiff electing to stand upon their amended petition, a judgment was rendered dismissing the action. Plaintiffs bring error.

*Louis J. O'Marr* and *Alex C. Shaw*, for Plaintiff in Error.

This was an action upon a written contract to which two points were urged in defense; 1st, that the contract was one to produce evidence and void against public policy, 2nd,

that conditions governing the purchase of capital stock had not been complied with by plaintiffs; the first point is refuted by the plain terms of the contract itself and does not come within the rule of public policy affecting the validity of contracts. (13 C. J. 448.) An agreement to furnish evidence is not invalid. (Wood v. Casserleigh, 71 Pac. 360; Smith v. Hartzell, 63 S. E. 172.) The suit is for damages for failure of defendant to repurchase the stock which was separate and distinct from the agreement to sell and deliver the stock. (13 C. J. 515; Packard v. Byrd, 51 S. E. 678.) It is contended by defendant that the obligation to purchase stock was conditioned upon the issuance of patent for the lands and as only a part of the lands were patented, the condition was not fulfilled. Paragraph 4 of the contract made the terms of purchase absolute. It was not incumbent upon plaintiff to allege what the agreement really was, there being an ambiguity in its terms. (Durkee v. Coda, 16 Pac. 5; Lambert v. Haskell, 22 Pac. 401; Hill v. McCoy, 81 Pac. 1016.) The contract is ambiguous in terms but it is the policy of the law to uphold contracts rather than destroy them where a contract is susceptible of two meanings one of which would destroy and the other render it enforceable. (13 C. J. 539. Richardson v. Altoona, 100 Pac. 50.) Considering the terms of the contract here in question, it should, in view of the transaction be construed to require defendant to repurchase the stock. (Salisbury v. Spafford, 126 Pac. 400; Catron v. Joseph, 1 L. R. A. N. S. 1120.) The delivery of the stock was in reality in the nature of collateral security for the payment of a debt. In such cases the courts hold that the debt must be paid within a reasonable time. (Noland v. Bull, 33 Pac. 983; Johnston v. Schenek, 50 Pac. 921; Busby v. Mining Co., 75 Pac. 725; Harkinson v. Dry, 6 Colo, 69; 13 C. J. 684.) The demurrer to the amended petition should have been over ruled.

*C. A. Zaring* and *Lonabaugh and Wenzell,* for Defendant in Error.

The petition shows that patent was not issued for the lands in accordance with the agreement, and therefore does not state a cause of action. More over the contract sued upon is void as against public policy. The terms of the contract are not severable; no cause of action could arise until all of the lands are patented. Conditions precedent must be performed before the agreement of the parties becomes valid and binding, and this must be shown by the petition. (Redman v. Eetna Co., 4 N. W. 591; Gould on Pleadings, Chap. 4, Sec. 13. Patrick v. Smelting Co., 38 Pac. 236.) Breach of condition is a breach of the whole contract, which gives to the other party the right of avoiding it. (2 Parsons on contracts, 656.) Where the obligation hinges upon the happenings of a contingency, its occurrence must be alleged in an action for recovery. (Root v. Childs, 70 N. W. 1087; Briggs v. Rutherford, 101 N. W. 954; Wilson v. Clark, 20 Minn. 367; Husenetter v. Gullikson, 75 N. W. 541; Sutton v. Lowry, 104 Pac. 545; Hall v. International Union, 170 S. W. 631; Floyd v. Pugh, 77 So. 323.) The contract was void as against public policy in that there was an agreement to give testimony in support of applications to the Government for land patents, for which $7,000.00 was to be paid in stock, which stock the party of the second part agreed to purchase at par value within one year from the date of the issuance of the patent. Such agreements are condemned by the court as supplying a strong temptation to the committing of perjury. (9 Cyc. 500; Greenwood, Public Officers, 5.) An agreement to receive pay for the giving of evidence is void as against public policy. (Quirk v. Muller, 36 Pac. 1077; Hughes v. Mullins, 92 Pac. 758; Cowes v. Co., 71 N. E. 468.) An agreement to pay a witness a per centage of any recovery based upon his testimony is an incentive to perjury. In re Imperatori, 163 N. Y. S. 675; In re O'Keefe, 142 Pac. 638; Goodrich v. Tenny, 19 L. R. A. 371; Patterson v. Donner,

48 Cal. 369; Stanley v. Jones, 7 Ving. 369; Boardman v. Thompson, 25 Ia. 487; Neese v. Joseph, 30 L. R. A. N. S. 278; Wright v. Sommers, 125 Ill. App. 256.

An agreement to pay a witness a sum contingent upon the success of a contemplated suit is void. (2 Elliott on Contracts, 721.)

POTTER, C. J.

In this case a general demurrer was sustained to the amended petition, which had been filed by leave of court after a like demurrer to the original petition had been sustained, and the plaintiffs electing to stand upon their amended petition a judgment was rendered dismissing the action. The case is here on error for the review of that judgment.

The action was brought to recover damages for the alleged failure of the defendant to purchase and pay the agreed price for certain shares of the capital stock of a corporation. The amended petition alleges: That on or about March 14, 1914, the plaintiffs and defendant entered into a written agreement whereby the defendant promised to purchase from the plaintiffs, and they agreed to sell to the defendant, seventy shares of the capital stock of the Torchlight Drilling & Mining Association, Limited, at the par value of one hundred dollars per share, within one year from the date of the issuance of patent to said association by the United States Government for the east half of section 24, township 55 north of Range 83 west, in the state of Wyoming, for which patent the said association had theretofore applied; said stock having theretofore been issued to plaintiffs by the defendant pursuant to said agreement. That the agreement provided that as soon as patent issued the defendant should notify the plaintiffs thereof and designate some solvent bank in the city of Portland, Oregon, to act as trustee and to whom plaintiffs should deliver their certificates of stock until payment should be made therefor. The alleged agreement is then set out in full in said petition. That shows an agreement between the seven plaintiffs, as parties of the first part, who are named therein and describ-

ed as all of Portland, Oregon, and the defendant, as party of the second part, who is described as of Basin, Wyoming; dated March 14, 1914, and it recites that on the 9th day of December, 1904, the parties of the first part executed and delivered to R. B. Magruder a certain power of attorney authorizing him to locate and dispose of mineral lands in their names; that said Magruder transferred said power of attorney to Philip Minor, who made use of the same for the location of mineral lands upon the public domain, and by such authority took up 320 acres of land in the State of Wyoming, to-wit: the east half of section 24, Township 51 North, Range 93 West; that said Minor, acting under authority of said power of attorney, transferred said land to the Torchlight Drilling & Mining Association, Limited; that in the month of December, 1910, said association made final proof on said land and sought to obtain a patent to the same from the United States Government; and "that the Government required certain testimony from the parties of the first part," and "that the said parties of the first part, believing that they had certain rights and interests in the land, and that they have never received any benefits or things of value for their rights or services." The agreement then provides as follows:

"NOW THEREFORE, it is hereby agreed that the parties of the first part will aid and assist the said Torchlight Company to procure a patent to said lands, and for that purpose will make affidavit or affidavits concerning their acts and intentions in connection with the whole matter, and if required will give such testimony whenever called upon to do so by the party of the second part, or his representative, and in all other ways give such help to obtain such patents as they may be able to furnish. It being understood between the parties hereto that such affidavits must agree with the truth as shown by the affidavits given Special Agent Rath and the statements this day made to said D. L. Darr.

"In consideration of such services to be rendered in be-

half of said Torchlight Company, or to the party of the second part, the said party hereby agrees to issue to the parties. of the first part seventy shares of the stock of the said Torchlight Company of the par value of one hundred dollars per share.

"It is further agreed that the party of the second part will buy said stock at its par value within one year from the date of the issuance of said patent, provided, however, that as soon as such patent is issued the said party of the second part shall notify the parties of the first part by letter addressed to their now known addresses, and shall at the same time designate some solvent bank in the City of Portland, State of Oregon, to act as trustee and to whom the parties of the first part shall immediately deliver their certificates of said stock to be held by such trustee until payment for the same shall be made at the price above stated, and within one year from the date of the issuance of said patent.

"It is mutually understood and agreed that the promise to buy said stock is absolutely binding upon the party of the second part and the agreement to sell to the party of the second part is absolutely binding upon the parties of the first part, and at the par value of said stock.

"IN WITNESS WHEREOF we have hereunto set our hands and to a duplicate copy thereof the day and the year above written."

The agreement as thus set out in the petition appears to have been signed by each of the parties, and its execution acknowledged by each on the day of its date before a notary public in the County of Multnomah in the State of Oregon. Following the said alleged copy of the agreement, it is further alleged that on August 25, 1915, more than one year prior to the commencement of the action, patent to a part of the "above described land" was issued to said Association by the United States Government, to-wit: (describing same by sub-divisions situated in Section 24, Twp. 51 N., R. 93 West). That said Association, before the issuance of the patent, and without the knowledge, consent or fault of

plaintiffs, or either of them, abandoned and waived its claim and right to the remaining part of the east half of said section, not included in the patent, and by reason of said abandonment and waiver, patent for all of said east half was not issued; and that such abandonment and waiver was with the knowledge, consent and at the instance of the defendant. That it was intended and understood by the terms and conditions of said contract that the plaintiffs were obligated to sell to defendant, and the latter was obligated to purchase from the plaintiffs said stock at its par value within one year from the time of the issuance of the patent. That at all the times mentioned plaintiffs have been and now are able, ready and willing to sell and deliver said shares of stock to defendant, or to deliver the same to any trustee designated by him according to the terms of said agreement, and that defendant has wholly failed, neglected and refused to accept and pay for said stock, or to designate a trustee to whom the same may be delivered as provided by said agreement, although defendant has been heretofore requested to do so. That plaintiffs have performed each and every of the terms, conditions and stipulations of said contract on their part to be performed. That by reason of the premises, plaintiffs have been damaged in the sum of $7,000, no part of which has been paid, although demanded. The prayer is for judgment for said sum with interest from August 25, 1916.

The variance in the above recital between the description of the land in the contract and in the preceding averment of the amended petition with respect to the township and range occurs in said petition. In alleging the agreement to purchase the stock, it describes the land as in Township 55 N. of Range 83 W., while the contract describes it as in Township 51 N. of Range 93 W. In the corresponding averment of the original petition, the range was described as 93, as in the contract. In a later averment of the amended petition the land for which patent was issued is alleged to be part of the "above described land," and the town-

ship and range are described as 51 N. and 93 W., thus agreeing with the description of the land in the contract as set out in the petition, indicating that the variance aforesaid may have been the result of inadvertence; and it may be deemed as of no importance on this hearing, since no question is raised concerning it, and if, as we suppose, the same tract of land was intended by the description in the first averment of the petition aforesaid as that mentioned in the contract, and as including the land for which patent was issued, the mistake can easily be remedied by amendment.

It is conceded by the briefs that two points only were suggested in the court below against the sufficiency of the amended petition, and they are urged here in support of the ruling sustaining the demurrer, viz: 1. That a part of the land having been excluded from the patent, as shown by the petition, it affirmatively appears thereby that the condition precedent of the obligation to purchase the stock had not occurred. 2. That the contract is void as against public policy.

The second point, challenging the validity of the contract, is based upon the provision therein for the giving of testimony by the plaintiffs in aid of the application for the patent; and it is contended that the giving of such testimony was the consideration for the promise to purchase the stock, and that the contract, in substance and effect, provides for the payment of $7000, the agreed purchase price, as compensation for the giving of such testimony contingent upon the issuance of the patent as the result thereof. But cases are cited indiscrimately to the effect that contracts to procure testimony for a compensation made to depend upon the favorable character of the evidence to be secured, or upon the result of the litigation in which it is to be used, or to testify for a compensation dependent upon the recovery or the amount of it, or for a sum in excess of legal witness fees, are contrary to public policy and illegal, because offering enticement to perjury and tending thereby to pervert the course of justice. They state the general rule as to the

several classes of contracts mentioned.    (6 R. C. L. 756, 757; 13 C. J. 448, 449; Quirk v. Muller, 14 Mont. 467, 36 Pac. 1077, 25 L. R. A. 87, 43 Am. St. Rep. 647); and see notes to the case of Hughes v. Mullins, 36 Mont. 267, in 13 Ann. Cas. 212 et seq., Wood v. Casserleigh, 30 Colo. 287, 71 Pac. 360, in 97 Am. St. Rep. 145 et. seq., and Neece v. Joseph, 95 Ark. 652, 129 S. W. 797, in Ann. Cas. 1912 A, 657, and in 30 L. R. A. (N. S.) 278 et. seq.)   But as to each class of such contracts there are exceptions to the rule or qualifications limiting its application.   And the question here is whether any such rule is applicable to the facts of this case shown by the amended petition.

Every contract to procure testimony or to testify as a witness is not necessarily illegal.   "An agreement by a person to testify is not, in the absence of anything else, contrary to public policy, particularly where it does not appear that he is to receive more or less than the usual or ordinary witness fees.   Where, however, his compensation is contingent on the success of a litigation, or he is to be paid more than his legal fees or other elements occur which tend to show that his evidence may be improperly influenced, the contract is against public policy."   (13 C. J. 448, 449.)   "At least where it does not appear that he is to receive more than the ordinary witness fees, one who promises to testify agrees to do what is entirely proper for him to do, and that which the law would compel him to do without any agreement. Standing alone, as a rule, such an agreement would not be a sufficient consideration to uphold an executory contract; but it is not an immoral or illegal stipulation, and should not have the effect of avoiding a contract that is otherwise legal and binding."   (6 R. C. L. 756, 757.)   Where a witness simply consents to make a disclosure of the truth with no inducement to produce any special result, the rule does not apply.   (Nickelson v. Wilson, 60 N. Y. 362.)   In Yeatman v. Dempsey, 97 E. C. L. 628, (7 J. Scott, N. S.) it was said by Erle, C. J.: "Every man has full power to contract to do that which is not prohibited by law; and, if a

party chooses to contract to attend and give evidence without a subpoena and without conduct-money, I see no reason why he should not be allowed to do so." In that case, where one had been employed in the capacity of surgeon and apothecary to collect and prepare medical and other evidence material to a suit, and attend and give evidence at the trial, for a stated compensation, it was held that damages, if any were shown, might be recovered upon the breach of the agreement by the party so employed through his failure to appear and tender himself as a witness at the trial.

· To bring a case within the rule invalidating contracts to testify for a compensation exceeding ·legal fees, where that is the only ground of objection, it must appear that the required testimony was such as might be compelled, or, in other words, that the agreed compensation is to be paid for performing merely a legal duty, and also, of course, that fees for the service required of the witness are fixed by law. In a comparatively recent case in New York, cited in defendant's brief, the rule is stated as follows: "Where a witness who is not interested in the result of the controversy resides in this state, and is amendable to process therein, an agreement to compensate him in an amount in e cess of the legal fees for attending as a witness and testifying only as to facts within his knowledge, is contrary to public policy and void." (Clifford v. Hughes, 139 App. Div. 730, 124 N. Y. Supp. 478.) In Armstrong v. Prentice, 86 Wis. 210, 56 N. W. 742, it was held that attendance as a witness in an action pending in another state is a sufficient and valid consideration for a promise to pay the witness more than legal fees since such attendance could not have been compelled, the court, by Winslow, J., saying: "It is objected that the plaintiff has recovered for attendance as a witness a sum largely in excess of legal fees, and that a promise to pay a witness more than legal fees for his attendance is void because he is simply performing a legal duty. However this may be in a case where the attendance of a witness may be compelled by subpoena, it certainly does

not apply in a case like the present, where the actions were
pending in another state, and the witness could not be com-
pelled to attend. In the latter case, it is evident that there
is sufficient consideration to support a promise to pay addi-
tional compensation.''

In the case of Dawkins v. Gill, 10 Ala. 206, often cited
upon this question and cited here, the court expressly ex-
cluded from consideration the question whether a fixed and
certain compensation might not be made to a witness who
could not be required by subpoena to attend in person, and
one of the grounds stated for holding the contract void, if
not the principal ground, was that the condition of the con-
tract that the compensation should be reduced one-half if
the party for whom the testimony was to be given was un-
successful in the suit gave the witness an interest in the re-
sult of the suit which, if valid and known, would have ren-
dered him incompetent to testify, since such interest would
be that of a party; a ground clearly inapplicable where a
party is not disqualified as a witness. So, in Walker v.
Cook, 33 Ill. App. 561, which holds that a witness attending
court upon a subpoena is not entitled to recover, upon a con-
tract for compensation, an amount exceeding the legal fees,
the court said: ''If no subpoena had been served upon him
and he had attended as a witness under an agreement for
compensation made with appellant, and not in pursuance
of the processes of the court, a different question would be
presented.''

In Dodge v. Stiles, 26 Conn. 463, the leading case in this
country holding that the statutory fees is all that a witness
is entitled to where he has been summoned to attend and
testify, and that any attempt to secure more is against the
policy of the law, the court stated the reason of the rule
and certain exceptions thereto as follows:

''Were it otherwise, and witnesses might be allowed to
make terms for testifying, there would be room for oppres-
sive conduct and for corruption. Witnesses, knowing that
their testimony was indispensable would, under one pre-

tence or another, make terms for their testimony, and such as might be induced to represent their testimony as important would be tempted to barter their oaths at the expense of truth and justice. Now, a promise to pay more than the statute fees for just this statute service, without further service or loss by the witness, may be said to be without consideration. It can not be important in our view, whether the promise be made after the service of the subpoena, co-temporaneously with it, or before, provided the promise refers to this duty and is founded on no other consideration. * * * There may be a further consideration, in which case an executory promise for extra compensation will be upheld; as if the witness was about going abroad at the time he might be wanted to attend court, and agrees that he will remain and give up his journey and is summoned; or living at a distance from the place of the court, more than twenty miles, so that his deposition could be taken, agrees that he will attend in person. In this, and the like cases, the promise is one for indemnity, and is founded on a new and meritorious consideration, and is good. * * * If a witness agrees with a party, that he will attend and testify without being summoned, and he is not summoned, and so not brought under the order or censure of the court, we suppose any reasonable promise for compensation is good, and may be enforced; for the proceeding or service is not under nor in pursuance of the statute."

The case of Nickelson v. Wilson, 60 N. Y. 362, has been cited above. Nickelson and one Scott were under indictment for obtaining certain notes of Wilson by false pretenses. Wilson had sued them for the amount of the notes, and Scott had commenced bankruptcy proceedings against Wilson. An agreement made between counsel for Nickelson and Wilson, by their authority, provided substantially as follows: That Nickelson shall testify to all he knows in the bankruptcy case, and in the civil and criminal case; that if no judgment be recovered against Scott in the civil case, there shall be none against N. and if judgment goes

against both it shall not be enforced against N. for more than $1000, which may be paid in one of Wilson's notes; that Nickelson shall have control for his benefit of the judgment against Scott for the sum he is to account for to Wilson. Nickelson testifying fully as above, the counsel will recommend nol. pros. against Nickelson. Wilson's counsel was the district attorney. Pursuant to the agreement Nickelson waived his personal privilege and testified for Wilson in the civil and bankruptcy case, and also on the criminal trial as a witness for the prosecution. Wilson recovered judgment against Scott and Nickelson for the amount of the notes, upon which the latter paid $1000, but Wilson and his assignee in bankruptcy refused to release him from the judgment, or to transfer an interest therein, and thereupon the action was brought by Nickelson against Wilson and his said assignee for specific performance of the contract, and to restrain them from enforcing the judgment against him in violation thereof. Upon the contention that the contract was void because of Nickelson's agreement to testify under the stated conditions, the court construed the agreement as requiring merely a disclosure of the truth, with no inducement to produce any special result, but the contract was held valid also upon the ground that Nickelson was under no legal duty to testify, the court saying: "The performance of this agreement involved a waiver by Nickelson of his personal privilege to decline to answer questions, his answers to which might tend to criminate him; and this waiver constituted the consideration for the whole agreement." And the court concluded the discussion by saying:

"The defendant deemed the testimony of the plaintiff essential to enable him to recover the judgment in question. It is conceded and found that the plaintiff performed his part of the agreement; and it is fairly presumable that the judgment was obtained by means of his testimony. It would be exceedingly unjust to enforce that judgment against him under the circumstances."

A similar case in principle is Cobb v. Cowdery, 40 Vt. 25, 94 Am. Dec. 370. The contract required Cowdery to give one Downer information as to witnesses and what could be shown by them in a suit in which the latter was interested, and required Downer, in consideration of such service, to deliver up to Cowdery, to be satisfied, a certain judgment upon which the action had been brought against him. The contract having been set out in Cowdery's answer, it was claimed that it was without consideration on the ground that Cowdery had agreed thereby to do no more than he was under legal and moral obligation to do, and that it was illegal and void because fixing a price on his testimony as a witness. The court held that although the duty to furnish the information without reward might be established by the principles of ethics as a moral duty, "it was a duty of imperfect obligation and one which could not be enforced at law," and said: "Whatever might have been Cowdery's duty to Downer in respect to furnishing this information to him, it was a duty which the law did not impose and could not enforce; and, however strong may have been his moral obligation to do that which he agreed to do, it is only promises founded on the performance of duties imposed by law which are regarded in law as merely gratuitous and not binding. * * * If this was a contract to suppress evidence, it would clearly have been illegal on this ground, but there is no such feature in it. It was a contract to give information in respect to evidence—to disclose and not to suppress the truth—and the tendency of the disclosure cannot be regarded as in any respect interfering with or obstructing the administration of justice."

The contract in the case at bar provided for the giving of testimony by plaintiffs only in the form of affidavits. It does not appear therefrom that the plaintiffs had been or that it was contemplated that they might be subpoenaed as witnesses, or that they were or would be amendable to any such process. The making of an affidavit is usually a voluntary act. (1 R. C. L. 761; 1 Ency. Pl. & Pr. 309, 310.)

And it cannot be compelled, in the absence of a statute authorizing such procedure. (2 C. J. 377. Bacon v. Magee, 7 Cowen 515; Crenshaw v. Miller, 111 Fed. 450.) And no statute has been cited under which the affidavits to be made by plaintiffs could have been compelled, or prescribing fees therefor, and we know of none. Until 1903 no witness fees in land office hearings concerning the public lands of the United States were provided for by law, nor was there any provision for summoning witnesses or compelling their testimony at such hearings, but their appearance was voluntary. (Weaks v. Cobb, 2 L. D. 223; In Re Higday, 10 L. D. 385.) By an act of Congress approved January 31, 1903, (32 Stat. 790), provision was made for the compulsory attendance of witnesses before the register and receiver of a land office, or before a commissioner to take the deposition of a witness residing outside the county in which the hearing occurs, and providing also for witness fees. See Commissioner's Circular Letters, 32 L. D. 132, 33 L. D. 58, 36 L. D. 473, 39 L. D. 601. But no provision is made by said statute or amendments thereto for compelling testimony by affidavit or allowing fees therefor. It is clear, therefore, upon the facts shown by the petition demurred to, that the contract cannot be held invalid on the ground that it provides for compensation for the performance merely of a legal duty, or in excess of legal fees.

But the point that seems to be most strongly urged against the validity of the contract is that the provision for the purchase of the stock within one year after the issuance of the patent is, in effect, an agreement to pay the stated price as a part of the consideration for the giving of the testimony, contingent upon the patent being issued as a result of such testimony. Counsel do not agree in their construction of the contract with reference to the effect of that provision. Counsel for plaintiffs insist that it is a separate and independent provision, and that the sole consideration for the giving of the testimony was the promise to issue the stock, basing that construction, principally, upon the further pro-

vision in the contract declaring the promise to buy and the promise to sell the stock to be "absolutely binding upon" the parties respectively. And they also contend that, in any event, the contract is not invalid, for the reason that the plaintiffs agreed only to testify to facts within their knowledge at the time, which had been reduced to writing and given to the special agent and stated to the defendant, and that the delivery of the stock was in no way contingent upon the outcome of the proceedings for patent or the issuance thereof; nor upon the character of evidence to be given. And, finally, that the stock was issued and delivered in settlement of the claims of plaintiffs in the land applied for.

Without deciding the question whether defendant's promise to purchase the stock is to be construed as part of the consideration for the giving of the affidavits, that may be conceded for the purpose of the discussion. But we think it should not be conceded, from what appears in the contract alone, that the obligation to purchase the stock was made dependent upon the character of the evidence to be given by plaintiffs or its effect in procuring the patent. The agreed service of plaintiffs was not to procure the patent, nor to establish the applicant's right thereto. They were merely to make affidavits as to the truth concerning their acts and intentions concerning the matter recited in the contract, and that it was so understood by the parties seems to be disclosed by the alleged fact of the issuance of the stock to plaintiffs before the issuance of the patent. It was not a part of the condition of the obligation to purchase the stock that the patent should be issued as the result of the affidavits, but the provision therefor, as we understand the contract, was to become effective upon the issuance of the patent, without regard to the effect of the affidavits as a controlling or contributory cause, though it was no doubt expected that the giving of the affidavits would assist in procuring the patent upon the application then pending.

In that view of the contract, it may be at least doubtful whether the rule invalidating contracts to furnish or give

evidence for a compensation contingent upon the result would be applicable. In the leading English case on the subject, Stanley v. Jones, 20 Enc. C. L. 169 (7 Bing. 369) the party seeking to enforce the contract held to be invalid had represented to the other party that he was in possession of evidence to prove that the latter was entitled to recover a considerable sum of money from other parties, and had agreed to communicate such evidence upon receiving a stated sum of money expended in obtaining such evidence, and upon the promise to pay him one-eighth of the amount of money thereafter recovered from said other parties, or either of them "through the means of him, Stanley, after the payment of the expenses of recovering such money." And in Pollak v. Gregory, 22 N. Y. Super. Ct. (9 Bosw.) 116, cited and distinguished in Nickelson v. Wilson, *supra,* and cited here by defendant, the contract was held illegal for the reason that it provided for a further payment upon the condition that the testimony given "shall have been such as led to the satisfactory termination of said suits to the interest" of the party for whom the testimony was to be given. But, referring to the rule contended for, where the parties contracting to furnish the evidence, might be required to testify, the court says, in J. I. Case Threshing Co. v. Fisher, 144 Ia. 45 : "But here there was no inducement held out to defendants to procure evidence that should accomplish a specific result," and it was held that there was nothing in the transaction tending "in the remotest way to the corruption of justice." And in Haley v. Hollenback, 53 Mont. 494, 165 Pac. 459, where the contract was between a litigant and a stranger to the controversy, and provided that the latter was to search for bona fide witnesses and such bona fide, competent, and legitimate testimony as he might be able to obtain to be produced upon the trial, and the litigant agreed that "if she should recover in her said suit, she would pay plaintiff well for such services," the contract was held to be valid; the case being distinguished from two cases previously decided by the same court, and often cited on

this question, Quirk v. Muller, and Hughes v. Mullins, *supra.*, the court saying :· ''Plaintiff did not agree to furnish evidence that would establish defendant's claim, nor was he to have any portion of the possible recovery.'' See also Neece v. Joseph, 95 Ark. 552, 129 S. W. 797, Ann. Cas. 1912 A. 655, and Josephs v. Briant, 108 Ark. 171.

It is unnecessary, however, to decide whether or not the contract in this case might be sustained alone upon the ground that the plaintiffs did not agree to give such testimony as should be sufficient to establish the applicant's right to the patent, or in connection with the fact that the plaintiffs could not be compelled to give the required testimony. There is another element in the contract clearly distinguishing it from the contracts. held to be invalid in the cases cited in support of defendant's contention here. The recitals show that the plaintiffs were not strangers to the subject matter of the proceeding in which their affidavit testimony was to be used. It recites, in substance, that the lands had been located in their names under the Mineral Land Laws of the United States under a power of attorney executed by them, and transferred under the authority of that instrument by the party to whom the power had been transferred, and that they believe that they had certain rights and interests in the land, for which and their services they had received no benefit or thing of value. We are not informed as to the precise nature or extent of the rights or interests in the land claimed by the plaintiffs, or which they believed they had, either by the contract or any averment of the petition, and the petition, including the contract therein set out, is all we have before us on this hearing. Nor do we think it necessary, as against the demurrer, for the petition to have alleged the nature and extent of the rights or interests which the contract recites the plaintiffs were claiming or believed they had. But we think it must be assumed at least that the plaintiffs were claiming or be-lieved that they had substantial interests for which, though transferred by authority of the power of attorney, they had

received no consideration. It seems also reasonable to sup-
pose that the Government was requiring of the plaintiffs,
.as original locators of the land, the required affidavit testi-
mony, and that the same was deemed essential by the de-
fendant to complete the showing to establish the right to
the patent applied for, or to satisfy the Government as to
the applicant's good faith in the matter. And in that re-
spect, since the plaintiffs were under no legal duty to furnish
the evidence, the cases of Nickelson v. Wilson and Cobb v.
Cowdery, *supra,* are strongly in point, the difference in
those cases being that the consideration for the agreed testi-
mony was the cancellation of a judgment. For it was said
in the Nickelson case that under the circumstances it would
be exceedingly unjust to enforce the judgment against him,
and in the Cowdery case that when the agreement was per-
formed on his part, it became an accord executed and accepted in satisfaction of the entire claim on the judgment.

But in all of the cases cited or that we have seen establish-
ing or applying the rule avoiding contracts to furnish or
give testimony or evidence, whether for excessive fees, or
for a compensation dependent upon the result, the party
to whom the compensation was to be paid was an entire
stranger to the transaction or controversy; and that fact
is stated in several of the cases. In the leading case of
Stanley v. Jones, *supra.,* the court said that the party was
"a stranger to the controversy." In Lyon v. Hussey, 31
N. Y. Supp. 281, it is said: "Here was a layman, who was a
stranger to the transaction, and who forced himself upon
the attention of defendant with a statement of his ability
*  *  * to employ counsel  *  *  * and procure the
evidence." And in Clifford v. Hughes, *supra,* the rule as
to a witness was stated so as to apply only to one "who is
not interested in the result of the controversy, and resides
within this state, and is amenable to process therein."

Where, however, the witness is shown to have been other-
wise interested in the proceeding or the subject matter
thereof, a contract for compensation, though dependent upon

the result, has been sustained. (Wellington v. Kelly, 84 N. Y. 543; Smith v. Hartsell, 150 N. C. 71; Gaines v. Molen, 30 Fed. 27.) In Wellington v. Kelly, it appeared that when a trustee was seeking to foreclose and collect a mortgage given by one Brown, which a receiver had satisfied and discharged and delivered to one Hill upon payment by him of the amount due, Hill had entered into an agreement with Brown to furnish him the papers and evidence necessary to defeat the foreclosure action, and Brown agreed that if said action should be defeated with such papers and evidence, and a recovery on the mortgage finally prevented, he would pay Hill one-half of the amount of the mortgage. That action was defeated by judgment for the defendants, and Hill's assignee sued to recover upon said agreement. Brown having died pending the action, his executors were substituted as defendants in his stead, and they contended that the agreement was illegal "for the reason that it tended to pervert justice by holding out an inducement to Hill for the fabrication of false papers and the furnishing of false evidence." The court first say: "In considering the question of the validity of the contract, it is to be observed that no corrupt intention appears upon its face; and, construing it in view of the situation of the parties, and of what was done under it, there is no ground for supposing that it was entered into for the purpose of perverting justice by the production of false testimony in support of the defense in the foreclosure action." Then, after referring to the peculiar relations between Hill and Brown through the payment of the mortgage voluntarily by the former, and the several questions that might be presented thereby concerning Hill's rights and Brown's legal or moral obligation to him, the court say further:

"It will be seen that the respective rights and obligations of Hill and Brown, growing out of the payment by Hill, and the subsequent transactions, were not free from doubt; and under the circumstances mentioned the agreement in question was made. * * * As between Brown

and Hill it was equitable that, if Brown was able to avail himself of the act of Hill as a payment of the mortgage, he should indemnify Hill for his advances; and we perceive no objection to the recovery in this case unless the rule is that every agreement made by a third person to furnish evidence in a litigation for a compensation contingent upon the result is illegal. I find no authority for so extensive a proposition. In Stanley v. Jones, (7 Bing. 369) * * * the person making the agreement to communicate the information was an entire stranger in interest to the proposed litigation, and professed to have knowledge of facts of importance to the party, but which he did not disclose. Lord Denman said that such an agreement was illegal for its manifest tendency to pervert justice, and we fully assent to the decision in that case. * * * But in this case Hill was not a stranger in interest to the subject of the litigation. His antecedent relation to the mortgage made it just that he should be indemnified for the money advanced by him in case his payment should be available to Brown in the foreclosure action. The mere fact that the agreement might furnish a temptation to Hill to prevaricate, or furnish false testimony does not, we think, stamp the agreement as illegal *per se*, and no illegal or improper intent on the part of any of the parties is disclosed by the evidence.''

Smith v. Hartsell, supra, was an action brought upon a contract between the heirs at law of a decedent and Smith, whereby said heirs agreed that in case they should recover the estate, they would pay out of the money received a stated sum, which was justly due said Smith from the decedent, and the said Smith agreed ''to do everything proper and legitimate, and to aid them in every way to recover said estate, and to give all and true evidence when called upon, in any suit that it may be necessary to bring in reference to said estate.'' It was contended among other things that the contract was contrary to public policy because containing a stipulation to testify

m a court of justice. The court, after stating the general rule condemning contracts to procure testimony to establish a given result, or contracts to testify for a sum made to depend on the recovery or the amount of it, and citing cases in support of the rule, said:

"But this contract, as we interpret it, does not necessarily come under the condemnation of any of these decisions. The agreement of plaintiff in this respect was to give all true evidence, 'when called on in any suit it may be necessary to bring to recover the estate.' " It does not appear, certainly not on the face of the agreement, that he is to receive more or less than the usual or ordinary fees of a witness for so testifying. He only agrees to do what is entirely proper for him to do, and which the law would compel him to do without any agreement. Standing alone, as a rule, this agreement would not be a sufficient consideration to uphold an executory contract, but it is not an immoral or illegal stipulation, and should not have the effect of avoiding a contract that is otherwise legal and binding. (Cobb v. Cowdery, 40 Vt. 25; Nickelson v. Wilson, 60 N. Y. 362; Wellington v. Kelly, 84 N. Y. 543.) According to the complaint, the facts of which are admitted, the plaintiff held, as heretofore stated, a valid and just debt against the estate of G. W. Robbins, and could have enforced its collection by law. This course would and might have involved delay, and defendants, who were the true owners of the estate, agreed to pay plaintiff's claim and just debt for which these assets were liable, whenever this estate was recovered and came into their hands; the plaintiff, on his part, to do everything that was 'legitimate and proper to aid them and to give true evidence whenever called on.' "

Gaines v. Molen, supra, is closely in point. The action in that case was brought to compel the specific performance of a contract to convey an undivided half of certain real estate in Hot Springs government reservation in Arkansas. It appeared that Gaines had executed a quit-

claim deed to defendant Molen, and that on the same day said defendant executed a contract to convey an undivided half interest in the property within thirty days after acquiring title from the government. The deed was placed on record immediately, but the contract was kept secret until after the acquisition of title from the government. The defendant averred both want and illegality of consideration, and the court said, that in face of the recitals in the contract, the burden of proof was on them to make good their defense. The deed and contract were executed after the United States Supreme Court had decided that the title to said reservation was in the government, and not in either of the three existing claimants. The land was within the limits of a tract which plaintiff had purchased years before, and which had been enclosed and cultivated by him. The defendant, Molen, had permission from the plaintiff to occupy the ground in controversy and build upon it, and a few months prior to said transaction, he did build a small house thereon. Plaintiff agreed to furnish the evidence to enable the defendant to establish his claim to the property, "if an anticipated act for the benefit of the occupants of Hot Springs should be passed by Congress," and, when such act was passed creating the Hot Springs Commission, said defendant filed his petition before the commission, asking the right to purchase, and said plaintiff gave testimony before the commission upon which the certificate of purchase was awarded to defendant. The decision was by Circuit Judge Brewer, who said:

"I think it very clear that the claim of defendants that this contract was without consideration and that the consideration was illegal, cannot be sustained. Obviously, there was a settlement between the parties. The plaintiff William H. Gaines had some claims, as between himself and defendant, to the ground, and probably to the buildings, which were settled and adjusted by this deed and contract. He unquestionably had that prior occupancy which it was thought might be of value in the future acquisition of title

from the government, and which in fact proved to be of value, the benefits of which defendant sought to acquire, and did acquire. The plaintiff was not simply contracting to furnish testimony to support a claim of the defendant believed to be good, or believed to be fictitious; but he was contracting with a view of preserving his own rights, and uniting the claims of himself and defendant in the one person, for the greater convenience, and in the hopes of better success, in any proceeding which might be initiated. The fact that he contracted to furnish the testimony, and did in fact furnish it, works no estoppel as between himself and defendant. (Hobbs v. McLane, 117 U. S. 567, 6 Supreme Court Reporter, 870.) The contract which was made, was in no manner a violation of any act of Congress, nor did it contravene any public policy. It was a contract between two parties who might possibly be contesting claimants under some future act of Congress for a settlement of their respective claims. The case of Southerland v. Whittington, 46 Ark. 285, is very much in point, and the decision of that learned court is in accord with the views I have expressed. See also, Lamb v. Davenport, 18 Wallace 214.''

That case was cited with approval upon the point that in the absence of a statute making a contract illegal which disposes of conflicting claims to public lands, such a contract is not void, in St. Louis Mining Co. v. Montana Mining Co., 171 U. S. 657, which case affirmed the decision in Montana Mining Co. v. St. Louis Mining Co., 20 Mont. 394, 51 Pac. 824, and held, that where an application for patent to a mining claim embraces land claimed by another, the latter is under no obligation to file an adverse claim, but may make a valid settlement with the applicant by contract, which can be enforced against him after he obtains his patent. And the court, by Mr. Chief Justice Fuller, said:

''Where there is a valid location of a mining claim, the area becomes segregated from the public domain, and the property of the locator. There is no inhibition in the Mineral Lands Act against alienation, and he may sell it, mort-

gage it, or part with the whole or any portion of it as he may
see fit. (citing cases.)   The location of the Nine Hour Lode
was in all respects sufficient and valid.   When the dispute
afterwards arose between Robinson and Mayger as to a por-
tion of it, there was nothing to compel the filing of an adverse
claim.   The settlement made gave Robinson an equitable
title immediately, and ultimately he was to have the com-
plete legal title, to a piece of ground, which it seems right-
fully belonged to him.   The Government was not defrauded
in any way, nor was there any legal or moral fraud involved
in the transaction.   The settlement and adjustment of the
dispute with reference to the right of possession appears
upon its face to have been satisfactory to the parties when
made, and should be upheld unless contravening some stat-
ute or some fundamental priciple of law recognized as the
basis of public policy.   There was no such statute, and set-
tlements of matters in litigation, or in dispute, without re-
course to litigation, are generally favored, and are appar-
ently of frequent occurrence in regard to mining land
claims; nor is there anything in the decisions of this court
to throw doubt on their validity.''

The facts were that Mayger had applied at the Land Of-
fice for a patent to the St. Louis Claim, and in the survey
included a part of the Nine Hour Claim, whereupon its own-
ers brought an action against Mayger to determine the right
to the possession of the particular premises, and, for the
purpose of settling and compromising that action, and agree-
ing upon the boundary lines between the two claims, May-
ger executed ad delivered a bond for a deed to the owners
of said Nine Hour claim, whereby he agreed that upon ob-
taining a patent as applied for, he would execute and de-
liver a good and sufficient deed for the premises which, it
was agreed, was a part of the last mentioned claim.   May-
ger then obtained a patent upon his application, and the ac-
tion in the case cited was brought to compel the agreed con-
veyance.   See also U. S. v. Biggs, 157 Fed. 264, where the
cases on the point are reviewed.

Whether the plaintiffs had or were claiming such an interest as would have furnished a reasonable ground for the bringing of an action to determine the right of possession, or that would have rendered the issuance of the patent as applied for inequitable as against them, we do not know, and that can be disclosed only by further proceedings in the case. But, in view of the facts recited in the contract, it is not inconceivable that they may at least have had or claimed such an interest, and might have protested the application for patent, or, under certain conditions, instituted adverse proceedings in the land office. For, although the Federal statute relating to adverse claims opposing the issuance of patent to a mining claim has reference only to claims arising from independent and conflicting locations of the same ground, and not to a controversy between co-owners or parties claiming under the same location, the rules and practice of the Land Department permit one claiming as a co-owner to institute adverse proceedings as well as to file a protest, though such a party is not required to do either, but may assert his equity in the patent title in an action to have the patentee declared trustee for his benefit. (Davidson v. Frazer, 36 Colo. 1, 84 Pac. 695, 4 L. R. A. (N. S.) 1126; Lindley on Mines, 2nd and 3rd editions, §§ 646, 728; Morrison's Mining Rights, 10th Ed. 413, 15th Ed. 605.)

We do not think it can properly be held upon the facts shown by the petition that the plaintiffs might not lawfully compromise or settle their claims in the manner provided by the contract in question, if that was the purpose thereof, or that the contract was illegal as against public policy on the ground stated.

The point stated as the first ground of objection to the petition, viz., that a part of the land having been excluded from the patent, the condition precedent of the obligation to purchase the stock had not occurred, is sufficiently answered, we think, by the averment of the petition to the effect that the applicant for the patent, before the issuance thereof, with the consent and at the instance of the defendant,

and without the knowledge, consent or fault of plaintiffs, or either of them, abandoned and waived its claim and right to the remaining part of the land not included in the patent, thereby causing the patent to be issued for the part only included therein. The principle is stated in Case v. Beyer, 142 Wis. 496, quoting from Jones v. Walker, 13 Mon. 163, as follows:

"He who himself prevents the happening or performance of a condition precedent, upon which his liability, by the terms of the contract, is made to depend, cannot avail himself of his own wrong and relieve himself from his responsibility to the obligee, and shall not avail himself to avoid his liability, of a non-performance of such precedent condition, which he has himself occasioned, against the consent of the obligee."

The doctrine is stated in Teachnor v. Tibbals, 31 Utah, 10, 86 Pac. 483, and cases cited in support thereof, as follows: "The law is that where one * * * voluntarily puts it out of his power to do what he agreed to do, in the way agreed upon, he commits a breach of contract and becomes liable generally." In that case the agreement was to pay as the balance of the purchase price of a mining claim a certain sum out of the first net proceeds of the sale of ore thereafter extracted therefrom. It was expected that sufficient ore would be extracted to pay such balance out of the net profits thereof, but the mine was sold by the obligated party before selling the ore, and it was held that he could not thereby escape liability. A pertinent statement of the rule is found also in Martin v. Rogers, 53 Tex. Civ. App. 423, wherein the court say:

"It seems clear that where a contract is made which is performable at the time of the occurrence of a future event, the law imputes to the promisor an agreement that he will put no obstacle in the way of the happening of the event, and that he will hold himself in readiness to cooperate where his cooperation is a necessary element in the happening of the contingency. If, in violation of this implied covenant

on his part, he does something which prevents the happening of the event, the contract becomes absolute, and must be performed as if the event had happened.''

The case of Dill v. Pope, 29 Kans. 289, is to the same effect, where the defendant, a purchaser of property at a stipulated price, payable upon a certain condition, had, by selling the property, disabled himself from complying with the condition. In holding that the defendant's liability thereupon became absolute, and the money presently due, Judge Brewer, delivering the opinion of the court, said, ''that a party to a contract who by his own act prevents the happening of a condition, is estopped thereafter to say that such condition has not happened. No party to a contract can interfere to prevent the performance of any condition, and then claim any benefit or escape any liability from the failure of such performance.''

It is necessary, therefore, to consider the question presented by the briefs as to whether the provision of the contract in question is to be construed as requiring the issuance of patent for all of the land as applied for, without omitting any part, as a condition precedent to the liability to purchase the stock.

Holding, for the reasons stated, that the court erred in sustaining the demurrer to the amended petition, it follows that the judgment must be reversed, and the case remanded for further proceedings not inconsistent with this opinion. It will be so ordered.

*Reversed and remanded.*

KIMBALL, J., and BLUME, J., concur.